## STANDARD ACC. INS. CO. v. BROCK.
### (No. 2936.)

Court of Civil Appeals of Texas. Amarillo. Jan. 4, 1928.

Rehearing Denied Jan. 25, 1928.

Insurance ☞665(4)—Evidence held to sustain finding that insured was disabled and confined in house within policy provision, notwithstanding frequent visits to doctor.

Evidence *held* sufficient to sustain finding of trial court that plaintiff suing on indemnity policy was unable to perform labor and necessarily confined within house under professional care and attendance of physician, within meaning and intent of policy, notwithstanding frequent visits to doctor.

Appeal from Lybbock County Court; Chas. Nordyke, Judge.

Action by Pinkney O. Brock against the Standard Accident Insurance Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Robt. A. Sowder, of Lubbock, for appellant.

Howard & Burks, of Lubbock, for appellee.

RANDOLPH, J. Appellée, Brock, filed this suit against appellant company to recover on an insurance policy given him to compensate him in the event of sickness.

All matters of fact as well as of law were submitted to the trial court, and, upon hearing the pleadings and evidence, he rendered judgment for the plaintiff. From this judgment, the company has taken an appeal.

The appellant makes the following propositions of error for our consideration, the decision of which controls the disposition of this case:

First. That the plaintiff declaring upon an insurance policy, which he sets out in

his petition, must show that injury or loss is covered by the provisions of the policy.

Second. Plaintiff, making the policy a part of the petition, which policy required continuous confinement to his house and therein to be regularly treated and visited by a physician, for which an indemnity of $100 per month was allowed, and his allegations showing that he was not so confined, visited, or treated, do not bring him within the provisions of such policy, allowing such amount of indemnity.

Third. There being no evidence to show plaintiff was necessarily and continuously confined within his home by reason of his sickness, and that he was therein regularly visited and treated by a registered physician for 3 months and 20 days, and the policy providing indemnity at $100 per month only, under such conditions, it was error for the court to render judgment that for 3 months and 20 days he was so disabled, confined, treated, and visited, and, upon such finding, to award plaintiff the sum of $366.-67 indemnity by reason thereof.

The plaintiff's petition sets out the following cause of action in alleging the character of his sickness:

"3. That said plaintiff, on or about the 11th day of April, 1925, went to a certain dentist's office for the purpose of having a tooth extracted, to wit, Bloom & Bloom, dentists in the city of Lubbock, Lubbock county, Tex. That said dentists after examining said tooth, and without the consent or permission of this plaintiff, injected some character of medicine, which is unknown to this plaintiff, in and around the gum of said tooth and then did extract said tooth. That immediately thereafter the jawbone of plaintiff became infected and swollen to the extent that plaintiff was by reason thereof, and by reason of the excruciating pain suffered by plaintiff, totally disabled from performing any and every kind of business and labor and was necessarily and continuously confined within his house and was therein under the professional care and attendance of and regularly visited by a legally qualified registered physician, within the terms, meaning, and intent of said policy, for a period of 3 months and 20 days, and for a period of 30 days thereafter was partially incapacitated from pursuing his ordinary work and occupation.

"4. That if the court should find that plaintiff was not necessarily and continuously confined within his home and that he was not regularly visited by a legally qualified registered physician, then plaintiff would show that by reason of the nature of his ailment and disability, to wit, the serious infection of the jawbone, the plaintiff could not obtain the necessary medical treatment in his home, and on account of the fact that the treatment required not only the extensive use of medicines of various kinds, but required the use of the operating tools, utensils, and equipment usually found in a hospital or physician's office and parlors, it was impossible and impractical for his physician to visit him within his home, and, plaintiff being a poor man, was unable to go to a hospital and continuously remain there until cured, and, by reason of the premises, plaintiff says that his sickness and disability comes within the meaning and purview of the terms of said policy because, he says, that if he was not continuously confined to his home that it was due to the absolute necessity of being carried to the doctor's office for treatment, and that if his physician did not visit him within his home, nevertheless, he treated plaintiff in his office for the reasons given above, and because it was impossible and impracticable to give plaintiff the necessary treatment elsewhere."

The following clause of the insurance policy contains the provision relied on to authorize the judgment in this case:

"Paragraph E. Subject to all of the provisions and limitations of section 3 of the insuring clause, in the event that the insured shall suffer from any bodily sickness or disease not hereinafter excepted, the company will pay the monthly indemnity as specified in the insuring clause, per month, or at that rate for any proportionate part of a month, for a period not exceeding twelve (12) months, as the insured, solely by reason of such sickness, shall be necessarily and continuously confined within the house and therein be under the professional care and attendance of, and therein be regularly visited by, a legally qualified registered physician."

### The plaintiff testified as follows:

"After this policy was issued to me, I was sick. The first trouble I had was a bad tooth—appeared to be bad tooth. I suffered quite a bit for something like a week or ten days, and got to where I thought I had better consult a dentist about it, and I went down to Bloom & Bloom, dentists, and I told them I thought I had a bad tooth, and they made an examination of the tooth, with the result that they decided it ought to be extracted, and they proceeded to extract the tooth; and after the tooth had been extracted something like an hour or an hour and a half, why this trouble set in, I can't hardly explain it, I went to several physicians, and they didn't seem to understand what it was. The way it affected me was all the way around my face on that side, from chin to ear, on the left-hand side of my face. It just seemed sorter like the jawbone was fixing to break out of the jaw, and that continued for about 30 days or over that time. I consulted with some four or five different physicians, Dr. Lattimore and Dr. Hall, and Doctors Starnes & Castleberry and others, you know, around town here; I don't remember who all I did consult, but some five or six physicians, and none of them could give me anything for it, or give me any advice, just advised me to take asperin, things like that, and it didn't have any effect on me, and it went on that way about four or five weeks, and of course I knew there must be something wrong, and I consulted Dr. Hutchinson, and he wanted to take an X-ray, and we had the X-ray took, and he couldn't find anything that he thought could be the cause of the trouble, and then a swelling come out of my jaw here, and just gradually moved till it got right here, and it got to be about the size of a hen egg, and he decided it had better be lanced. They didn't understand what it was caused it. This lump on my jaw finally got to be about the size of a hen egg.

"When I went to Bloom & Bloom to have my tooth extracted, they injected something in my jaw. He didn't say anything to me about injecting anything into my gums. I told him to examine the tooth, to see what he thought about it, and he said he thought it needed extracting, and I told him if it did to go ahead, so he proceeded to fix up the medicine. I didn't ask him what it was and he fixed me up and said that would be all right. Of course, I went back to him several times after this tooth was extracted, I thought it was the jawbone might be involved, or something, and he examined it and couldn't find anything; couldn't find any cause for this condition.

"I do not know what he injected into my gums. After I taken sick I wasn't able to do any work. I was at home, I mean I was at the place where I was living, the place I called home. I wasn't doing any work. I had a little business at that time. I was looking after it myself up till the time my jaw got hurt, I was running the place myself until I got where I couldn't. I had this tooth extracted, I believe it was the 10th or 11th of April, in the year 1925. After that tooth was extracted, I tried to work for a few days, I forget how many days, I was around there for something like a week, it was something like a week until I was able to employ a boy to stay there. After that week was up, I was at home nursing my jaw; I wasn't able to do any work. I stayed at home continuously, in the house.

"Occasionally I left the house; I left when I had to. I had to go down and take treatment from the doctor. I went to Dr. Hutchinson's office. I went every morning. The reason I went down there instead of him coming to my house, they said they couldn't very well take the instruments they had to use up there you know, and they didn't think it would make me any worse to come to the office. I went there for six months continuously. As to how long I was at the house and the doctor's office without work from the time my tooth was extracted, it was something like four months before I was able to knock around, be away from the house, able to do anything or knock around anywhere. The doctor wouldn't permit me to work any until he dismissed me. It was six months from the time she commenced—six or seven months from the time the tooth was extracted. It was four months that I didn't knock around any; I stayed in the house. I was confined to the house there, I was in all of the time. Some of the time I would be in such misery I wouldn't be able to stay in the bed; I was out walking the floor. As to how much time I was in bed, I was just up and down, down and up; I couldn't say how much of the time I was lying on the bed; there was most of the time I was in such misery I couldn't sleep or do anything else. I didn't continue to have my business during the time of this illness. I got a boy at first, but of course the business pretty soon got down to where it wasn't paying anything, so I leased the place to a fellow and he couldn't make anything, and he kept it something like six or eight weeks and closed it up, and it stayed closed quite a while, and I finally leased it to another fellow, and he stayed there a little while and finally closed up, and it stayed closed up."

The trial court found that the plaintiff was totally disabled from performing any and every kind of business and labor and was necessarily confined within his house under the professional care and attendance of a legally qualified registered physician within the meaning and intent of the policy sued on, for the period for which recovery was allowed, and was partially incapacitated for a period of 30 days thereafter from pursuing his ordinary work and occupation.

We are of the opinion that this finding is supported by the pleadings and the evidence. In the case of Southern Surety Co. v. Diercks, 250 S. W. 755 (writ denied), the Texarkana court, speaking by Judge Hodges, and considering the following explanatory charge given by the trial court: "Confinement to the house does not necessarily mean a constant literal restraint within the house; and an occasional visit to the office of her physician for treatment, or taking exercise and walking as a part of the plaintiff's treatment would not necessarily mean that she was not at such times confined to her house as contemplated by the policy or contract in evidence in this case"—held that it was the duty of the trial court to construe such contract, as it was in writing, and that there was no error in the giving of the explanatory instruction to the jury.

Judge Conner, in an able opinion in the case of Federal Surety Co. v. Waite, 297 S. W. 312, discusses the question here involved and the various decisions pro and con upon the subject, and holds in harmony with the Diercks Case, and says:

"We approve the more liberal construction adopted by our own case last cited and those cited in connection therewith. The purpose that must have been in the mind of the insured at the time of the taking out of her policy was that she would thereby be indemnified for loss of time for the period specified if occasioned by sickness which would totally incapacitate her from performing her usual work. And the policy construed as a whole, it seems to us, would naturally create such an impression. We think it is evident, as said in one of the cited cases, that the requirement that the insured must be confined within her house or home is but evidentiary. The only legal purpose for the insertion of such a requirement would seem to be that thereby a total loss of time and incapacity to labor would be shown with certainty. While such confinement in the house might present undoubted evidence of a loss of time and incapacity to labor, in this case the court has found the fact that plaintiff by reason of her sickness was in fact totally incapacitated to labor and lost the time for which indemnity was awarded, and this finding is not questioned, and must therefore be accepted by us as an undisputed fact. It cannot therefore be said that appellant has been prejudiced by the failure of plaintiff to literally prove confinement to her home during the entire term of her disability."

The facts of total incapacity and loss of time are established by the evidence, and, this issue controlling the disposition of the case, we affirm the judgment of the trial court.